78 F.3d 605
 38 U.S.P.Q.2d 1506
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
GNB BATTERY TECHNOLOGIES, INC., Plaintiff/Cross-Appellant,
v.
EXIDE CORPORATION and General Battery Corporation,
Defendants-Appellants.
 Nos. 95-1248, 95-1348, 95-1371.
 United States Court of Appeals, Federal Circuit.
 Feb. 20, 1996.
 
 Before LOURIE, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and BRYSON, Circuit Judge.
 DECISION
 BRYSON, Circuit Judge.
 
 
 1
 Exide Corporation and General Battery Corporation (collectively "Exide") appeal from a judgment of the United States District Court for the District of Delaware holding Exide liable to GNB Technologies, Inc., for patent infringement. GNB cross-appeals from the district court's denial of an award of lost profits on sales that Exide made to two retailers. Because the jury's verdict was supported by substantial evidence and because the district court did not commit reversible error in ruling on the lost profits issue, we affirm.
 
 BACKGROUND
 
 2
 GNB and Exide manufacture replacement batteries for auto-mobiles. Their customers are retailers who sell batteries to individual consumers. Because different automobile models require batteries that differ in power, size, and type of electrical connection, retailers must stock a variety of battery models in order to meet customer demand.
 
 
 3
 For example, because the correct polarity must be maintained when connecting a battery to an automobile's electrical components, automobile manufacturers often provide connecting cables that are no longer than necessary to ensure proper connection. Thus, in some cars the positive cable is longer than the negative, and in others the opposite is true. That difference in automobile design has resulted in "left-handed" and "right-handed" battery designs. Automobile manufacturers also use different types of battery connectors. In some of its models, for example, General Motors uses a threaded connector that screws into the battery's terminal end. Other automobile manufacturers use a traditional clamp connector that is secured around a battery terminal post. Because of differences in battery types and connecting devices, sellers of replacement batteries have had to stock multiple battery models to meet customer demand.
 
 
 4
 Over time, as the number of battery models increased, battery retailers experienced inventory problems. The multitude of battery models strained retailers' storage requirements as well as their ability to ensure battery freshness. To alleviate those problems, battery manufacturers began designing more versatile batteries that could be adapted to the requirements of different automotive makes and models. One such design was the "dual terminal" battery, i.e., a battery with two pairs of positive and negative terminals, one pair accommodating automobiles having the screw-type connection and the other pair accommodating the clamp-type connector. Another design eliminated the "handedness" of a battery by centering the top terminals. Such a battery could be adapted to either right-handed or left-handed electrical systems simply by rotating the battery 180 degrees during installation.
 
 
 5
 In 1987, GNB obtained U.S. Patent No. 4,701,386 ("the '386 patent"), directed to a dual terminal battery with terminal ends on the side and top of the battery, and with centered top terminals. Claim 1 of the '386 patent, the sole independent claim, reads as follows:
 
 
 6
 A dual terminal, electric storage battery comprising:
 
 
 7
 (a) a container;
 
 
 8
 (b) a cover;
 
 
 9
 (c) a single pair of element posts in electrical communication with electrochemical components;
 
 
 10
 (d) a single pair of terminal bushings substantially completely embedded in said cover, each of said bushings being electrically connected to one of said element posts and comprising,
 
 
 11
 (i) a body portion,
 
 
 12
 (ii) a side terminal end, which side terminal end is mounted through an opening in an angled surface of said cover, which angled surface is at an angle acute to the plane generally contiguous to the top surface of said cover,
 
 
 13
 (iii) a top terminal end, which top terminal end is mounted through an opening in said top surface of said cover on or in the vicinity of its longitudinal center line,
 
 
 14
 (iv) an element post end,
 
 
 15
 (v) a first connecting arm extending sideways from said body portion to said side terminal end,
 
 
 16
 (vi) a second connecting arm extending sideways from said body portion to said top terminal end, wherein said body portion and said element post end define a hole passing axially there through and adapted to receive therein one of said element posts;
 
 
 17
 (e) a pair of side terminals in electrical communication with said side terminal ends of said bushings; and
 
 
 18
 (f) a pair of top terminals in electrical communication with said top terminal ends of said bushings.
 
 
 19
 Exide also manufactures dual terminal batteries and has competed with GNB for large retailers' accounts. Both companies offer battery lines that include dual terminal and standard battery designs, as well as associated services for inventory control and marketing.
 
 
 20
 After several national retailers chose Exide as their battery supplier, GNB sued Exide for infringement of the '386 patent and sought lost profits related to the large retailers' accounts. In response, Exide contended that the asserted claims of the '386 patent were invalid for obviousness under 35 U.S.C. § 103. At trial, the jury returned a verdict finding that the claims were not invalid and that Exide had infringed GNB's rights under the patent. In the damages phase of the trial, the district court found that GNB had failed to show that Exide's infringement had caused GNB's loss of profits on accounts with Firestone and Montgomery Ward. Exide appealed on the liability issue, and GNB cross-appealed on the lost profits issue.
 
 DISCUSSION
 
 21
 A. Exide argues that the district court erred in denying its motion for judgment as a matter of law on the issue of patent validity. Exide contends that because all of the facts necessary for a determination of obviousness under 35 U.S.C. § 103 were either admitted or uncontroverted by GNB, no reasonable jury could have found the invention of the '386 patent nonobvious. Pointing to prior art references that teach the various components claimed by the '386 patent, Exide maintains that it would have been obvious to one of ordinary skill in the art to combine specific components of the prior art to arrive at GNB's invention.
 
 
 22
 In support of that contention, Exide principally relies on an affidavit that was submitted by one of the co-inventors of the '386 patent in the course of litigation between GNB and another battery manufacturer. In that affidavit, the inventor stated that even a lay person would have found it obvious to modify the dual terminal battery taught in Japanese Utility Model application 55-74,315 by centering the top terminals as taught in U.S. Patent No. 4,278,742 to Oxenreider. The inventor also stated that it would have been obvious to modify the dual terminal battery of the Japanese reference by adding the side terminals of U.S. Patent No. 4,337,301 to Rorer. Based on the statements in the inventor's affidavit and the absence of any disclaimer of those statements at trial, Exide argues that a reasonable jury would have had to find the '386 patent claims invalid for obviousness.
 
 
 23
 As the district court noted, the jury had the benefit of hearing testimony from the inventor, as well as expert testimony from each side, and thus could assess the significance of the statements in the inventor's affidavit on the ultimate issue of obviousness. We agree with the district court that neither the statements in the affidavit nor the inventor's testimony compelled the jury to find in Exide's favor on that issue. Even if the jury accepted the suggestion in the inventor's affidavit that it was obvious to center one set of terminals and add a second set of terminals on the side of the battery, that combination of features would not satisfy all the limitations of the '386 patent claims, such as the positioning of the side terminals at an "angle acute to the plane generally contiguous to the top of said cover."
 
 
 24
 Exide also relies on U.S. Patent No. 4,444,853 to Halsall. Although Halsall did not disclose a dual terminal battery, two of the embodiments in the Halsall patent are particularly relevant to the issue of obviousness presented in this case. One of Halsall's embodiments teaches screw-type side terminals on an acutely angled cover, while the second teaches centered top terminals. Both use a bushing that is embedded in the cover. Combined, the two embodiments would go a long way towards establishing a prima facie case of obviousness with respect to the '386 patent claims. Halsall, however, does not suggest that the two embodiments be combined. In light of the testimony of the expert witnesses with regard to the Halsall reference, as well as the other evidence on the issue of validity, we agree with the district court that there was substantial evidence in the record to support the jury's verdict that Exide did not show by clear and convincing evidence that the combination claimed in the '386 patent would have been obvious to one of ordinary skill in the art at the time of the invention.
 
 
 25
 B. On cross-appeal, GNB contends that the district court erred in denying an award of damages for lost profits. To recover lost profits, the patentee must show a reasonable probability that, but for the infringement, it would have made the sales that were made by the infringer. Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1545, 35 USPQ2d 1065, 1069 (Fed.Cir.) (in banc), cert. denied, 116 S.Ct. 184 (1995). The district court identified the correct standard; GNB's principal contention on appeal is that the district court erred in applying that standard to GNB's claims for lost profits in connection with a 1988 contract with Firestone and a 1990 contract with Montgomery Ward, both of which were awarded to Exide.
 
 
 26
 The district court found that GNB failed to show that Exide's infringement caused GNB to lose the 1988 Firestone contract. Although Firestone sought bids on a battery line that included dual terminal batteries, Firestone's bid specification made clear that alternative battery designs would be considered and that battery power was the key feature that Firestone was seeking. Moreover, the district court credited the testimony of Firestone's principal representative on the 1988 battery contract, who testified that cost, service, quality, and the ability to provide a direct delivery program were the major factors involved in Firestone's decision to select Exide as its exclusive supplier. The district court further noted that Firestone's decision was apparently influenced by the fact that Exide was already supplying 80 percent of Firestone's battery stock at the time of the 1988 contract, which made converting to a full line of Exide products easier than converting to a full line of GNB products. In light of the district judge's careful assessment of all the evidence bearing on the issue, we are satisfied that the court did not commit clear error in finding that GNB failed to prove it was entitled to an award of lost profits on the 1988 Firestone contract.
 
 
 27
 The district court also found that GNB failed to prove it would have won the 1990 Montgomery Ward contract but for Exide's infringement. Although a Montgomery Ward representative testified that dual terminal batteries were a prerequisite under the 1990 contract, GNB failed to show that noninfringing substitutes were unavailable. In fact, a third manufacturer, Delco, was still under active consideration until shortly before the award of the contract. Moreover, the district court credited testimony from the Montgomery Ward representative that Montgomery Ward had noticed a drop in the quality of GNB's batteries and was concerned about GNB's decision to market its Champion brand dual terminal battery through other distribution channels rather than exclusively through Montgomery Ward. In light of that evidence, the district court's ruling on GNB's claim for lost profits from the Montgomery Ward contract cannot be held clearly erroneous.